**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                 No. CR 07-1726 JB

DOMINGO RUIZ-PEREZ,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Sentencing Memorandum on Behalf of Defendant Domingo Ruiz-Perez, filed October 24, 2007 (Doc. 49). The Court held a sentencing hearing on November 5, 2007. The primary issues are: (i) whether Ruiz-Perez is entitled to a minor role adjustment for his involvement in the offense; and (ii) whether the nature and circumstances of Ruiz-Perez' offense, and his background and characteristics warrant a variance from the guideline sentence to time served. Because the Court agrees that a 2-level minor role adjustment is appropriate, the Court will overrule the objection to the Pretrial Sentencing Report ("PSR") as moot. Because the Court does not believe that the historical and economic context behind Domingo Ruiz-Perez' decision to enter the United States and assist in transporting other individuals is unique or otherwise justifies a variance from the guideline sentence, the Court will deny his request for a variance and sentence him at the low end of the advisory guideline range. For the reasons stated at the hearing, and for further reasons already stated, the Court will sentence Ruiz-Perez to 12 months and one day.

**FACTUAL BACKGROUND**

It is helpful to provide some historical and economic context behind Domingo Ruiz-Perez'

decision to enter the United States and to assist in transporting other individuals within the United States. See Sentencing Memorandum on Behalf of Defendant Domingo Ruiz Perez, filed October 24, 2007 (Doc. 49)("Sentencing Memo."). The United States does not dispute the background information. See United States' Response to Sentencing Memorandum on Behalf of Domingo Ruiz-Perez filed October 24, 2007 (Doc. 49), filed October 31, 2007 (Doc. 50)("Response").

Ruiz-Perez is a Mexican citizen from the State of Chiapas and ethnically is a Chamula Indian. See Sentencing Memo. at 2. He was born and raised in San Juan Chamula, a municipality of approximately 30,000-40,000 Maya Indians in the Chiapas highlands of southern Mexico. See id. at 2-3. Ruiz-Perez speaks some Spanish, but his native language is Tzotzil, an ancient Mayan dialect that predates contact with western European cultures. See id.

From the time of the Conquest in the sixteenth century, San Juan Chamula was one of the principal population centers of highland Chiapas. See id. The community is a direct heir to the long-standing Mayan culture that has predominated in southern Mexico and Guatemala for centuries if not millennia. See Sentencing Memo. at 2 (citing generally G. Gossen, Chamulas in the World of the Sun (Cambridge: Harvard Univ. 1974)).

Most Chamulan Indians live in hamlets that are scattered on ridges or in small basins across their mountain plateau. See Sentencing Memo. at 2. Subsistence agriculture dominates the local economy. See id. Families also tend flocks of sheep. See id.

Land scarcity among native Chamulans, however, has been a problem for the past several decades, enhanced not only by steady population gains but also by encroachments into the highlands by non-Mayan newcomers. See id. Increasing competition for land encouraged the clearing of forested areas, hastening the destruction of the local forests and adding to a marked depletion in soil fertility. See id. In many areas, slash-and-burn agriculture has accelerated to the extent that the land

cannot recover.  See id.  Compounding this destructive cycle is sheep grazing, which tends to denude the land of its fragile grasses, causing over-grazed pastures to slip into sterile expanses of earth.  See id.

Because land is limited,  few families can generate sufficient surplus agricultural product that is necessary to purchase basic commodities.  See id.  Many Chamulans enter into a form of share-cropping agriculture, essentially being paid in maize by the landowner, or they can hire themselves out as field hands to other Indians who might be renting the land.  See id. at 3.  Others might engage in a cycle of temporal migration, residing in the lowlands to work on coffee plantations then returning to San Juan Chamula for the balance of the year.  See id.  If none of these options are feasible or desirable, Chamulans may opt to become a member of an ejido, or a communal farm often located great distances from their homeland.  See id.

The advent in the 1990s of the North American Free Trade Agreement has resulted in the Mexican government's decreased reliance and encouragement of the ejido system, and in the termination of the Mexican government's special-guaranteed price for maize and other crops.  See Sentencing Memo. at 3.  Chamulans earn less and less for their corn as a result of NAFTA.  See id.

Against a backdrop of diminishing arable land and decreasing prices for subsistence crops, Ruiz-Perez made a decision to travel to the United States.  See id. He has rarely ventured outside of his municipio.  See id.

Ruiz-Perez' world view is very different from that of most people who live in the United States.  When his counsel asked him whether he had a "passport" or other papers to try to legally cross the border, Ruiz-Perez responded that he was unaware of what a passport was or that he would need "permission" to enter into the United States.  Sentencing Memo. at 3 n.1.

Limited schooling, an inability to participate in the greater Mexican society, combined with

the Chamulan community's independent spirit and centuries' old resistance to assimilating into Mexican culture, has left individuals like Ruiz-Perez ill-equipped to face the changing economic landscape of the twenty-first century. See id. at 3-4 (internal quotations omitted). Ruiz-Perez does not know how tall he is or how much he weighs, is unable to read a newspaper, and has lived his entire life as a corn farmer in his homeland of San Juan Chamula. See id. at 4 n.2. Life beyond the boundaries of San Juan Chamula or the State of Chiapas is an uncertain prospect and, for most Chamulans, is not in the realm of possibility. See id. at 4.

With a guaranteed-price system for maize and other commodities no longer providing a social safety net for the community, more and more individuals like Ruiz-Perez are taking drastic measures. See id. Despite having rarely ventured beyond his small village, and being able to speak very little Spanish and no English, Ruiz-Perez decided to travel to the United States. See id. The promise of being able to earn more dollars within several months than one could ever possibly earn in Chamula made this endeavor apparently worth the risk to Ruiz-Perez. See id.

Ruiz-Perez reports that the fact that his father and mother are elderly and ill, and unable to work, influenced his decision to travel to the United States. See id. Ruiz-Perez' father has always been a corn farmer, while his mother maintained the household and made the family's clothing. See id. In October 2005, Hurricane Stan swept through Chiapis and Yucatan, Mexico, damaging much of the landscape and destroying the vast majority of the crops that the local farmers had planted. Reports indicate that flooding and landslides caused by Hurricane Stan cut off 300,000 people in the Chiapas highlands. See id.; id. at n.3 (citing CASA de la Paz (Chiapas) a.k.a. "Chiapis Peacehouse" project's archives, http://www.chiapaspeacehouse.org/en/taxonomy/term/4 (providing numerous articles on the ravages of Hurricane Stan)). Ruiz-Perez' corn crop was lost to this storm. See Sentencing Memo. at 4. He found it impossible to feed his family. See id. at 5. In January

2007, Mariano, Ruiz-Perez' older brother, contacted him about the possibility of traveling to the United States to work for several months, to save money, and to help support their families in Chamula. See id.

While discussing these plans, a number of other Chamulans decided to join in the trip, all in equally dire straits. See Sentencing Memo. at 5. Ruiz-Perez, who was twenty years old at the time of his arrest, left the travel details to Mariano, who had recently been to the United States and seemed to know of the best ways to make the trip. See id. Mariano Ruiz-Perez loaned Ruiz-Perez some money, and then made all of the arrangements to travel from Chiapas to the international border, and then eventually to travel to Florida. See id.

The group attempted to cross once, was apprehended, processed, and voluntarily returned to Mexico. See id. at 7. The group then crossed again, this time successfully, through the Sonoran desert of Arizona. See id. at 8. It was after crossing the border that the group of eleven Chamulans was arrested in New Mexico en route to Florida. See Sentencing Memo. at 5.

**PROCEDURAL BACKGROUND**

On January 22, 2007, Domingo and Marino Ruiz-Perez, were arrested in Cibola County, New Mexico for a violation of 8 U.S.C. § 1324. See Response at 1; Criminal Complaint, filed January 30, 2007 (Doc. 1). On August 17, 2007, the brothers pled guilty to different charges. Domingo Ruiz-Perez pled guilty to one count of transporting an illegal alien in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). See Plea Agreement ¶ 3, at 2, filed August 17, 2007 (Doc. 46).

Domingo Ruiz-Perez signed a plea agreement pursuant to rule 11 of the Federal Rules of Criminal Procedure. See id. at 1. The parties estimated that his total offense level would be 13. See Response at 1. When, however, the USPO disclosed the PSR on October 11, 2007, it showed Domingo Ruiz-Perez's total offense level as being 15. See PSR ¶ 29, at 7. The USPO also

uncovered a conviction for public intoxication in Hamblen County in Tennessee General Session Court, which indicated that he had been in the United States at least once before the 2007 incident. See Revised PSR ¶ 34, at 9, disclosed October 31, 2007. The USPO calculated Domingo Ruiz-Perez' criminal history category as I. See PSR at 10. A criminal history category of I and an adjusted office level of 15 results in an advisory guideline imprisonment range of 18 to 24 months. See id. The PSR recommends a Guideline sentencing range of 18-24 months. See id. ¶ 49, at 11.

On October 15, 2007, Domingo Ruiz-Perez' counsel made an objection to the PSR regarding Domingo Ruiz-Perez' minor role in the offense. On October 24, 2007, Ruiz-Perez, through counsel, filed a sentencing memorandum requesting a sentence of time served. See Sentencing Memo. The sentencing memorandum analyzed his sentencing pursuant to the United States Sentencing Guidelines and 18 U.S.C. § 3553(a). See id.

The United States responded to Domingo Ruiz-Perez' objection. The United States agrees that a 2-level reduction, pursuant to U.S.S.G. § 3B1.2, is appropriate and that the total offense level should be 13. See Response at 2. An offense level of 13 combined with a criminal history category of I results in an advisory guideline imprisonment range of 12 to 18 months. See id. The United States is opposed to Domingo-Perez' request, because, according to the United States, a sentence of 12 months and one day, which is at the low end of the advisory guideline range, would be reasonable. See Response at 2.

On October 30, 2007, before the sentencing hearing, the USPO disclosed an Addendum to the PSR, recommending a 2-level role adjustment, thereby resulting in a suggested Guideline sentence of 12-18 months. As of October 31, 2007, Ruiz-Perez had been in custody for slightly more than 9 months. See Response at 2.

The Court held a hearing on this matter on November 5, 2007. See Transcript of Hearing

(taken November 5, 2007)("Tr.")(Court).[1]  Ruiz-Perez contended that, although he has visited the United States once previously, he still has very little experience in understanding how to cross into the United States, and that is why he left those details to Mariano.  See id. at 11:16-22 (Robbenhaar).  Ruiz-Perez contends that he was "along for the ride."  Id. at 11:25 (Robbenhaar).  Ruiz-Perez noted that he has never spent any appreciable time in custody before, and it has been extremely difficult for him because of his limited language skills.  See id. at 12:15-18 (Robbenhaar).  The United States contended that a sentence of 12 months and one day was a sufficient but not greater than necessary sentence.  See id. at 14:22-24 (Brawley).  The United States contended that economic motives underlie the vast majority of immigration cases.  See id. at 15:8-10 (Brawley).

## 8 U.S.C. § 1324

Transporting an illegal alien is punishable for a period of up to ten years in prison.  See 8 U.S.C. § 1324(a)(1)(A)(ii); 8 U.S.C.§ 1324(a)(1)(B)(i).  See United States v. Alvillar, 575 F.2d 1316, 1321 (10th Cir. 1978)(concluding that transportation of the aliens is an offense under 8 U.S.C. § 1324(a)(2)).  To establish a violation, the government must prove (i) the transporting or moving of an alien within the United States, (ii) that the alien was present in violation of law, (iii) that the defendant was aware of the alien's status, and (iv) that the defendant acted willfully in furtherance of the alien's violation of the law.  See United States v. Barajas-Chavez, 162 F.3d 1285, 1287 (10th Cir. 1999).

## ANALYSIS

The Court agrees with the parties and the USPO's assessment that Domingo Ruiz-Perez played a minor role in the offense.  The Court is not convinced, however, that a sentence of time

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

served is a reasonable sentence in this case. While Ruiz-Perez' background is sad, his violation of United States' immigration law was largely motivated by economic factors, which makes him, for the most part, indistinguishably from many similarly situated defendants who appear before the federal court on similar charges.

**I.     THE COURT WILL OVERRULE THE OBJECTION TO THE ORIGINAL PSR'S FAILURE TO GIVE DOMINGO RUIZ-PEREZ A MINOR ROLE ADJUSTMENT AS MOOT.**

On October 15, 2007, Domingo Ruiz-Perez' counsel made an objection to the PSR regarding Domingo Ruiz-Perez' minor role in the offense. The United States agrees that a 2-level reduction, pursuant to U.S.S.G. § 3B1.2, is appropriate and that the total offense level should be 13. See Response at 2. An offense level of 13 combined with a criminal history category of I results in an advisory guideline imprisonment range of 12 to 18 months. See id. On October 30, 2007, before the sentencing hearing, the USPO disclosed an Addendum to the PSR recommending a 2-level role adjustment, thereby resulting in a suggested Guideline sentence of 12-18 months. Because the USPO and the United States have agreed that a 2-level role adjustment is appropriate, and the Court is satisfied that Ruiz-Perez played a substantially less culpable role than his brother, the Court agrees with the parties and the USPO's current position and will give Ruiz-Perez a 2-level adjustment. Domingo Ruiz-Perez is more akin to a member of the group rather than a leader. Accordingly, Ruiz-Perez' objection to the USPO's failure to give him a minor role adjustment is moot.

**II.    THE ANALYSIS PURSUANT TO 18 U.S.C. § 3553(a) DOES NOT COUNSEL FOR A VARIANCE.**

Domingo Ruiz-Perez submits that an analysis of the factors set forth in 18 U.S.C. § 3553(a) warrant a sentence of time served. See Sentencing Memo. at 12. Domingo Ruiz-Perez' argument turns, however, on his contention that his particular case has a unique nature. See id. at 11. The

Court does not find Domingo Ruiz-Perez' case to be much different than many other immigration cases that the federal courts confront in this district, along the border, and throughout the nation.

### A.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE.

The offense involves two Chamulan brothers -- one forty years old and the other twenty -- traveling with a group of fellow Chamulans to the United States to seek work in Florida. See Sentencing Memo. at 8.  The circumstances of the offense -- as learned through the pre-trial interviews of the United States' material witnesses -- reveal an individual who had little understanding that the act of entering the United States without permission and helping transport other illegal aliens was illegal. See id.  Nevertheless, he should have some knowledge, because the group he was in attempted to cross once, was apprehended, processed, and voluntarily returned to Mexico.  Yet he attempted again.  The Court does not believe his level of knowledge justifies a variance from the advisory guideline sentence.

Domingo is not solely responsible for the crime.  On the other hand, Domingo Ruiz-Perez bears some responsibility for transporting the group. See Revised PSR ¶ 28, at 8; Sentencing Memo. at 8.  Furthermore, the United States has, with its charges against Domingo Ruiz-Perez, recognized that he is not solely responsible for transporting the group of aliens whom he was caught transporting on January 22, 2007. See Criminal Complaint, filed January 30, 2007 (Doc. 1).  For this reason, the United States charged Domingo Ruiz-Perez with transporting an illegal alien as opposed to bringing in illegal aliens for profit, see Information, filed August 17, 2007 (Doc. 43), the charge to which Mariano pled guilty.  Mariano is now facing a mandatory minimum sentence of three years because he was more culpable, whereas the advisory guideline range for Domingo Ruiz-Perez is 12 to 18 months. See Revised PSR at 12.

In addition, the United States has recognized the minor role Domingo Ruiz-Perez played in

-9-

the offense. See Response at 2. The United States thus stipulated to a role adjustment pursuant to U.S.S.G. § 3B1.2. See id. While Domingo Ruiz-Perez is more akin to a member of the group rather than a leader, the role adjustment already takes that factor into account.

Domingo Ruiz-Perez contends that his offense conduct is non-violent. See Sentencing Memo. at 9. Most immigration crimes, however, are non-violent crimes, yet Congress has decided that these crimes deserve severe sentences. The potential penalties associated with transporting illegal aliens signals congressional intent that it is a serious crime and not merely a regulatory offense.

Domingo Ruiz-Perez committed this federal offense because he was hoping to earn money to help support his family. Although his motives and ambitions are understandable, many defendants who are convicted of immigration offenses committed the offenses for economic reasons. Domingo Ruiz-Perez' situation is not significantly different from that of most defendants charged with immigration offenses. If an economic motivation alone were sufficient to justify a variance from the advisory sentencing guideline range, more defendants would qualify for the variance than those who would not. In the end, the Court does not see a factor in the nature and circumstances of the offense that warrants a variance from the advisory guideline sentence.

**B.     HISTORY AND CHARACTERISTICS OF DOMINGO RUIZ-PEREZ.**

Domingo Ruiz-Perez is from a starkly different culture than that in the United States. As a minority group in the Republic of Mexico, Chamulan Indians are economically and socially marginalized, living on the fringes of mainstream Mexican society. See Sentencing Memo. at 9. They reside primarily in their home region of the highlands of Chiapas, and lack economic and social power to have an effective voice in national government. See id.

Individual Chamulans are not likely to receive much education, are not likely to obtain high-

skilled, or high-paying jobs, and will most likely remain in the Chiapas region as subsistence farmers or low-skilled laborers. See id. Domingo Ruiz-Perez exemplifies this background, having known little of the world beyond Chiapas in his twenty years. See id.

Domino Ruiz-Perez did not fully understand and appreciate that his conduct of entering the United States and transporting other illegal aliens could be punished by years of imprisonment. See id. In his mind, he was coming to the United States to work with the hopes of helping his struggling family in Chiapas. See id. Furthermore, Ruiz-Perez' lack of international experience, his marginal language skills, and his lack of education left him ill-equipped to fully understand the ramifications of his decision to cross into the United States to travel to Florida in a post-9/11 world. See id. at 9-10.

After the group was first intercepted and then voluntarily returned, Domingo decided to try again, reasonably concluding that the act of walking across the border could not be a serious crime if the only consequence was voluntary departure. See id. Nevertheless, he should have concluded that the United States would not allow him in the country and that it was not appropriate for him to be here. Also, as the USPO discovered in putting together the PSR, Ruiz-Perez had been to the United States at least once before and had pled guilty to a crime. The Court is not convinced that Ruiz-Perez was so ignorant of federal immigration law that the Court should vary from the guidelines. The Court also does not see any other factor in his history and characteristics that counsel for a variance from the sentence the Sentencing Commission recommends.

**C.    THE NEED FOR THE SENTENCE IMPOSED TO PROMOTE RESPECT FOR THE LAW, PROVIDE JUST PUNISHMENT, ADEQUATE DETERRENCE, AND TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT.**

There is a need for the sentence imposed to promote certain statutory objectives. Domingo

Ruiz-Perez suggests that a sentence of time served would be appropriate. See Sentencing Memo. at 10. The Court cannot say, however, with confidence that Domino Ruiz-Perez is not likely to return to the United States in the future.

The Court is always concerned that, when it pronounces a sentence of time served to a defendant in the courtroom, it sends a misleading message to the defendants that the federal court does not take his crime seriously. While Ruiz-Perez has only a little more time left to serve in incarceration, the Court believes a sentence of 12 months and one day would better promote respect for the law, provide just punishment and adequate deterrence, and protect the public from further crimes, than a sentence of time served. During his time in the United States, he probably learned something about United States immigration problems. The Court is not convinced that the statutory objectives of punishment, deterrence, and promoting respect for the law will be well achieved by a sentence of time served. See Response at 5.

When the Court imposes a sentence of time-served, it may signal that the United States does not take his crime seriously. The Border Patrol may have inadvertently sent that signal to Ruiz-Perez earlier when it caught him and immediately released him. Ruiz-Perez will be in incarceration less than three more months. Each day of that three months will serve to remind him and re-enforce that he must not return to the United States. Thus, a reasonable sentence would be a sentence of 12 months and one day.

**D.     THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES BETWEEN DEFENDANTS WHO HAVE COMMITTED SIMILAR CRIMES.**

Most defendants charged with transporting illegal aliens could make arguments similar to the ones that Domingo Ruiz-Perez makes. See Response at 5. If Domingo Ruiz-Perez is entitled to a variance from the advisory sentencing guideline range based on the reasons that he has

provided, more defendants convicted of transporting illegal aliens would qualify for a variance than those who would not. The application of a variance would be more frequent than the application of the guideline.

In conclusion, the Court believes that it is reasonable to conclude that Domingo Ruiz-Perez is not entitled to a variance from the advisory guideline range of 12 to 18 months. The Court believes that the Sentencing Commission's advisory guideline sentence properly balances and reflects the factors in 18 U.S.C. § 3553(a). Accordingly, the Court will sentence Domingo Ruiz-Perez to 12 months and one day, which is the low end of the guideline range. The Court believes that a sentence at the low end of the guideline range is sufficient, without being greater than is necessary, to comply with the purposes of the Sentencing Reform Act.

**IT IS ORDERED** that the Defendant's objection in the Sentencing Memorandum on Behalf of Defendant Domingo Ruiz-Perez is overruled, and the request for a variance from the advisory guideline sentence is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Larry Gomez
  Acting United States Attorney for the
    District of New Mexico
Kimberly A. Brawley
  Assistant United States Attorney
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

John F. Robbenhaar
Albuquerque, New Mexico

    *Attorney for the Defendant*